IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

FILED BY _____ D.C.

05 MAY 31  AM 9: 34

ROBERT R. DI TROLIO
CLERK, U.S. DIST. CT.
W.D. OF TN, MEMPHIS

UNITED STATES OF AMERICA,

      Plaintiff,

v.                       No. 03-20104 B

OMAR ABDI JAMAL,

      Defendant.

---

## ORDER DENYING DEFENDANT'S MOTION OF ACQUITTAL AND FOR NEW TRIAL, DENYING DEFENDANT'S SECOND MOTION FOR A NEW TRIAL, DENYING DEFENDANT'S MOTION FOR ORAL ARGUMENT ON POST-TRIAL MOTIONS AND GRANTING DEFENDANT'S MOTION TO FILE REPLY BRIEF

---

On March 25, 2003, a six-count indictment was entered against the Defendant, Omar Abdi

Jamal, charging him with making false statements on immigration documents in violation of 18

U.S.C. §§ 1001 and 1546(a).  The statutes impose criminal penalties upon an individual who

> knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact; makes any materially false, fictitious or fraudulent statement or representation; or makes or uses any false writing or document knowing the same to contain any materially false, fictitious or fraudulent statement or entry . . . [and]

> knowingly makes under oath, . . . knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document which contains any such false statement or which fails to contain any reasonable basis in law or fact . . .

On January 7, 2005, the jury empaneled in this matter rendered a verdict of guilty on Counts 1

through 5.[1]  Jamal filed his motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules

of Criminal Procedure or, in the alternative, for a new trial under Fed. R. Crim. P. 33 on January 19,

---

[1]Count 6 was dismissed prior to trial.

This document entered on the docket sheet in compliance
with Rule 55 and/or 32(b) FRCrP on _5-31-05_

139

2005. On January 20, 2005, the Defendant filed a second Rule 33 motion for a new trial. These motions, along with the Government's responses thereto, are currently before the Court. Prior to reaching the merits, however, the Defendant's motion for oral argument on his post-trial motions is DENIED, as the issues have been fully briefed. Jamal's motion to file a reply brief is GRANTED, as the reply has been docketed and will be considered herein. The Defendant's motion for leave to complete the record is also GRANTED.

The primary focus of the Defendant's Rule 29 and 33 motions is directed to the evidence presented at trial, which he claims was insufficient to establish violations of §§ 1001 and 1546(a). In deciding a Rule 29 motion based on insufficient evidence, the relevant question is "whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Caseer, 399 F.3d 828, 840 (6th Cir. 2005) (quoting United States v. Bashaw, 982 F.2d 168, 171 (6th Cir. 1992)). "The government must be given the benefit of all inferences which can reasonably be drawn from the evidence, even if the evidence is circumstantial. It is not necessary that the evidence exclude every reasonable hypothesis except that of guilt." United States v. Carter, 355 F.3d 920, 925 (6th Cir. 2004) (quoting United States v. Head, 927 F.2d 1361, 1365 (6th Cir. 1991)). The Court cannot "weigh the evidence, consider the credibility of witnesses or substitute [its] judgment for that of the jury." United States v. Meyer, 359 F.3d 820, 826 (6th Cir.), cert. denied, ___ U.S. ___, 125 S.Ct. 112, 160 L.Ed.2d 182 (U.S. Oct. 4, 2004) (No. 04-5573).

Unlike Rule 29, Fed. R. Crim. P. 33 permits the trial judge to consider the credibility of witnesses and to weigh the evidence to insure there is no miscarriage of justice. United States v. Solorio, 337 F.3d 580, 589 n.6 (6th Cir.), cert. denied, 540 U.S. 1063, 124 S.Ct. 850, 157 L.Ed.2d

2

723 (2003).  A defendant's burden on a Rule 33 motion for a new trial is a heavy one.  United States

v. Ware, 282 F.3d 902, 906 (6th Cir. 2002).  While the granting of a motion for a new trial is

discretionary, such discretion should be used only in "extraordinary circumstances where the

evidence preponderates heavily against the verdict."  United States v. Damrah, 334 F.Supp.2d 967,

983 (N.D. Ohio 2004).  In issuing its ruling, the Court must keep in mind the provisions of Fed. R.

Crim. P. 52, which instructs that "[a]ny error, defect, irregularity, or variance that does not affect

substantial rights must be disregarded."  Fed. R. Crim. P. 52(a).

In order to establish a violation of § 1001, the Government must "demonstrate that:  (1) the

defendant made a statement; (2) the statement is false or fraudulent; (3) the statement is material;

(4) the defendant made the statement knowingly and wilfully; and (5) the statement pertained to an

activity within the jurisdiction of a federal agency."  See United States v. Logan, 250 F.3d 350, 361

(6th Cir.), cert. denied, 534 U.S. 895, 122 S.Ct. 216, 151 L.Ed.2d 154 (2001).  A conviction under

§ 1546(a) requires a showing by the Government that (1) the defendant made or presented a false

statement; (2) the false statement was knowingly made; (3) the statement was material to the

decisions of the Immigration and Naturalization Service (the "INS"); (4) the statement was made

under oath; and (5) the statement was included in an application or other document required by

immigration law or regulation.  United States v. O'Connor, 158 F.Supp.2d 697, 720 (E.D. Va. 2001).

According to the testimony adduced at trial, Jamal arrived at a Toronto, Canada airport in

November 1989 and applied with Canadian immigration authorities for refugee status.  On

November 28, 1989, he was found temporarily eligible for such status.  Jamal was permitted to live

and work in Canada in restricted employment.

Subsequently, the Defendant received notification of the refugee claim hearing scheduled to

3

determine his continued eligibility for refugee status. Pursuant to Canadian law, Jamal completed a form entitled "Personal Information Form for People Claiming Convention Refugee Status," which became a part of his immigration file. In the document, the Defendant listed his national ethnic group as "Somali, Majertan" and stated that he was born on February 1, 1969; had never been married and had no children prior to leaving Somalia. He further indicated that he had used a Kenyan passport to travel to Canada but that the passport had been destroyed. Prior to the refugee hearing, Jamal also prepared a claim summary, which became part of his file as well, with the assistance of a Canadian lawyer and a Canadian Immigration Court Somali language certified interpreter. The summary, signed by the Defendant under oath, related as follows:

> I am a citizen of Somalia, and a member of the Majertan tribe. My father, a former captain of the Somali military, became involved in anti-government activities, because of the way our clan was treated by the government. In 1978, he participated in a coup to topple the Barre regime, however this coup proved unsuccessful. After the failed coup, he remained with us in Mogadishu, but as the government pressure increased, he felt he had no alternative but to flee to Ethiopia, which he did in 1981. Also at this time, there was increased violence between the government and members of my clan. He went to Ethiopia and joined the SSDF, and he has never returned to Somalia. My last understanding, was that he was living in the Ogaden region in a place called Galadi, west of the Somali city of Galcaio, which is a large center of Majertan tribes people and is my father's original home.
>
> He did not tell us where he went.
>
>         *      *      *
>
> In April of 1987, I traveled to Ethiopia to visit my father. When I returned at the end of May 1987, I was arrested at my house. Apparently, the government had informants in Ethiopia and they were advised of my visit.
>
>         *      *      *
>
> I knew I had to get out of Somalia, based on this visit, my father's exile in Ethiopia, and my previous detention.

4

> I was able to obtain a Kenyan passport on the black market and my uncle got an airline ticket in Nairobi Kenya, for me to look like I was traveling for Nairobi to Mogadiscu to Frankfort, West Germany and then to Toronto. I removed the Nairobi, Mogadiscu portion of the ticket, got the Kenya passport stamped to appear as though I had exited Kenya and attempted to fly out. I was turned back by Somali immigration, but the next day, a different officer . . . allowed me on the plane, and I made my way to Canada.

Below Jamal's signature, the interpreter certified that "I have translated the contents of these 4 pages to the claimant from the English to the Somali language. He has assured me that he fully understands the contents of these pages as translated."

The Defendant was also required to obtain a medical assessment prior to his hearing. The physician who conducted the assessment interviewed Jamal in English and recalled in his history notes that Jamal was a member of the Majertan tribe and that his father had fled to Ethiopia. The Defendant proceeded to tell the same story to the doctor in English as that contained in the claim summary translated from Somali.

Based on the documents and evaluation referenced above, as well as additional information, Jamal was granted Convention Refugee status in Canada. He was later awarded permanent resident status on November 27, 1991, which conferred upon him all the rights and privileges of a Canadian citizen except for the right to vote. Upon obtaining such status, Jamal's whereabouts ceased to be monitored by Canadian authorities.

On October 7, 1997, Jamal entered the United States from Toronto as a non-immigrant visitor for pleasure with a required departure date of April 6, 1998. Although his intended city of visitation at the time of entry was listed as Minneapolis, Minnesota, Jamal reunited with Bashir Jama, a fellow Somalian he had known while both resided in Mogadishu. In November 1997, Jamal moved into Jama's apartment in Memphis, Tennessee, where he lived for the next year. Jama testified at trial

that during that time he observed Jamal communicating with others in English and described his housemate's English as better than his own.  Jama also learned to recognize the Defendant's handwriting.

In December 1997, Jamal enrolled at the University of Memphis as a non-degree student. In January 1998, he took the Tennessee General Education Development ("GED") test in order to obtain the equivalent of a Tennessee high school diploma.  Although the test was known to be difficult and was administered in English, Jamal passed on the first attempt.  The next day he applied as a full-time undergraduate degree student at University of Memphis.  All courses offered by the University of Memphis, with the exception of foreign language classes, for which Jamal did not enroll, were taught in English.

Five days prior to the expiration of his non-immigrant visa, the Defendant sought asylum in the United States.  On the asylum application, which Jama testified contained Jamal's handwriting, the Defendant, under oath, stated that his date of birth was February 1, 1973; his tribal group was Midgan; he spoke fluent English; he had married while living in Somalia; and he had a male child born in Somalia.  With respect to his father, Jamal made the following statement:  "My father disappeared in 1987.  I don't know if he is alive or not now.  However, he was considered dead.  It was in Mogadishu and he was taken by a special force and never returned."  In addition, Jamal claimed that he was "caught and arrested, because of my natural selection of my minority group I am a member of."  At trial, Jama, a member of the Majertan tribe, testified that there was a significant difference between the Majertan, a majority tribe in Somalia, and the Midgan, a minority group.

On May 20, 1998, the United States asylum office notified Jamal that his immigration interview was scheduled for June 11, 1998.  He was instructed in the notice that, if he could not

6

speak English fluently, he "must provide a competent interpreter." The Defendant appeared at the hearing with Jama as his interpreter. Jama recalled at trial that he took an interpreter's oath and certified that he could speak and understand English and Somali and that he would truthfully translate the asylum officer's questions and Jamal's answers thereto.

According to the testimony of Suzette Uthman, the asylum officer, the Defendant told her during the interview that he had entered the United States on October 20, 1997 at John F. Kennedy Airport ("JFK") in New York; that he had presented an imposter Kenyan passport upon entry; that he married his wife, a Somali citizen, in Mogadishu in 1990; that he had a son born in Somalia in December 1992 who had since died; that his parents were members of the Midgan tribe; that he never obtained asylum in any other country; and that he left Somalia and traveled to Kenya prior to entry into the United States. When asked about his time in Kenya, Jamal reported that he did not obtain permanent resident status there. According to Uthman, if Jamal had disclosed his Canadian refugee and permanent resident status, which he did not, he would have been excluded from consideration for asylum in the United States.

Further, the application for asylum completed by Jamal contained the following questions:

Do you or your spouse or child(ren) now hold, or have you ever held, permanent residence, or other permanent status or citizenship, in any country other than the one from which you are now claiming asylum? (Yes or No)

Have you or your spouse or child(ren) otherwise ever filed for, been processed for, or been granted or denied refugee status or asylum by any other country? (Yes or No) If YES, your answer should include an explanation of the decision and what happened to any status conveyed as a result.

After leaving the country from which you are claiming asylum, did you or your spouse or child(ren), who are now in the U.S., travel through or reside in any other country before entering the U.S.? (Yes or No) If YES, your answer should, by person, identify each country, the length of stay, status while there, the reasons for

leaving, whether the person is entitled to return for residence purposes and, if the person did not apply for refugee status or for asylum while there, why he or she did not do so.

The Defendant answered each of these questions in the negative. It is these negative answers which form the basis for the indictment in this case. In the instant motion, Jamal argues that the Government has failed to prove its case on the grounds that (1) the questions posed to him were ambiguous; and (2) a reasonable interpretation of his responses reveals that they were factually accurate or the result of confusion, misunderstanding, mistake or other innocent state of mind.

"A prosecution for a false statement under § 1001 or under the perjury statutes cannot be based on an ambiguous question where the response *may* be literally and factually correct." United States v. Gatewood, 173 F.3d 983, 986 (6th Cir. 1999) (quoting United States v. Gahagan, 881 F.2d 1380, 1383 (6th Cir. 1989)) (emphasis in original). "When a line of questioning is so vague as to be 'fundamentally ambiguous,' the answers associated with the questions posed may be insufficient as a matter of law to support [a conviction]." United States v. Carey, 152 F.Supp.2d 415, 427 (S.D.N.Y. 2001) (quoting United States v. Lighte, 782 F.2d 367, 375 (2d Cir. 1986)). "A question is fundamentally ambiguous when it is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought or offered as testimony." Id. (quoting Lighte, 782 F.2d at 375) (internal quotation marks omitted); see also United States v. Culliton, 328 F.3d 1074, 1078 (9th Cir. 2003), cert. denied, 540 U.S. 1111, 124 S.Ct. 1087, 157 L.Ed.2d 900 (2004) (definition applied to prosecution under § 1001).

The fundamental ambiguity defense has limited applicability, however. "As the use of the adverb 'fundamentally' makes clear, it is not enough for a question to be ambiguous because virtually

any question may be deemed ambiguous if one employs an adequately sophisticated analysis." Carey, 152 F.Supp.2d at 427.  Where the defendant contends that his answer was literally truthful and has offered a reasonable interpretation of an ambiguous question that would make his statement factually correct, "[i]t is incumbent upon the Government to negative" that interpretation.  Gatewood, 173 F.3d at 988 (quoting Gahagan, 881 F.2d at 1383).  The factfinder should consider extrinsic evidence in order to determine how a defendant interpreted a question.  Carey, 152 F.Supp.2d at 428.

"It is only in exceptional cases that a question is so ambiguous, fundamentally ambiguous, such that no answer can be false as a matter of law.  If there is no fundamental ambiguity, the jury resolves any ambiguities."  United States v. Damrah, No. 04-4216, 2005 WL 602593, at *8 (6th Cir. Mar. 15, 2005) (citing United States v. DeZarn, 157 F.3d 1042, 1048 (6th Cir. 1998)).  "A jury is permitted to find the element of knowledge if it believes that the defendant had 'deliberately ignored a high probability that the form contained material false information.'"  United States v. Williams, No. 01-4209, 2003 WL 1795693, at *5 (6th Cir. Mar. 26, 2003) (quoting United States v. Arnous, 122 F.3d 321, 323 (6th Cir. 1997)).

In cases involving false statements, the finder of fact may and, indeed, should consider contextual facts in determining whether a defendant had knowledge of the subject matter of the questioning and the circumstances surrounding how he came to that knowledge.  See DeZarn, 157 F.3d at 1049 (in perjury prosecution, government must be permitted to present and jury to consider evidence of contextual facts in determining guilt).  While a conviction for making a false statement cannot stand if the answer given is literally true, the literal truth of the statement is a question for the jury to decide, taking into account "the context of the testimony as a whole."  Carey, 152 F.Supp.2d at 423-24.

As to the first question, Jamal submits that the query is compound, forcing the possibility for truthful yes AND no answers, and that there is no opportunity for explanation or for an indication that the respondent does not understand what is being asked. He contends that his "no" response was correct as to a portion of the question; that is, he never held Canadian *citizenship* or *citizenship* in any country other than Somalia. Jamal also suggests that there is no indication that he understood his "convention refugee" and "landed immigrant" status in Canada to have any relationship to the "permanent residence" or "permanent status" phrases used on the American application. In addition, the Defendant avers that it would have been reasonable for him to assume that whatever status he had in Canada was lost or could be lost if he left the country for a specific period of time, which he claimed he did. This, he insists, coupled with the asylum officer's acknowledgment that she did not know exactly what the Defendant meant by his answer or to which portion of the question the answer referred, mandates a finding of insufficient evidence to convict.

In connection with the second question, Jamal asserts again that it was ambiguous and that his negative response was factually correct "with respect to portions of the question as he understood it." He posits that, as he was either a "convention refugee" or a "landed immigrant" in Canada and that neither Canada nor Kenya had "asylum" status, his "no" answer was technically accurate. Conversely, he argues that he did not understand the difference between "convention refugee" or "landed immigrant" and "asylum," based on the asylum officer's failure to explain what was meant. Moreover, Jamal points to evidence suggesting that when he arrived in Canada as a teenager, older relatives assisted him in seeking legal status in that country. Therefore, while *others* may had sought asylum on his behalf, *he*, by *himself*, did not, in fact, seek asylum in Canada.

With respect to the last question, Jamal concedes that his negative response to the query on whether he had passed through another country on his way to the United States contradicts his statement in the same form that he had spent three years in Kenya, but argues that the inconsistency was based on confusion rather than a "lie." He relies on the trial testimony of the asylum officer to the effect that the inconsistent answers illustrated confusion in her opinion.

In this case, it appears to the Court that the Defendant is arguing two opposites at once; that is, that he was both sufficiently fluent in the English language to parse the questions to his advantage based on hyper-technical differences in terms and, at the same time, completely unable to understand the questions or the proceedings. Jamal cannot have it both ways. First, the questions were clearly not "so ambiguous, fundamentally ambiguous, such that no answer can be false as a matter of law." Nor were the inquiries, in the Court's view, compound. Moreover, viewing the evidence in the light most favorable to the Government, sufficient evidence existed to support the jury's finding that Jamal did understand English based on the testimony of Jama; the documents in his immigration files indicating that he participated in the process in English with no apparent difficulties; his statement in the asylum application that he spoke fluent English; and his ability to pass the GED examination and attend college classes taught in English. Furthermore, although the Defendant argues that extrinsic evidence concerning his immigration to Canada and his life in the United States is irrelevant to his understanding of the questions for which he has been prosecuted, the Court disagrees. Clearly, Jamal's previous experience with immigration proceedings, particularly in another English-speaking country, as well as his ability to function in the United States, are relevant to his understanding of immigration procedures and the language.

The Defendant's attempt to offer as additional evidence of the alleged lack of proof in this

11

case the jury's "deadlock" on January 6, 2005 holds no sway with the Court. After more than three days of trial, the jury had deliberated for some three hours in the afternoon when they sent a note to the undersigned stating that they were not close to reaching a decision. When questioned concerning whether they believed further deliberation might result in a verdict, the jury responded that they would like to continue the following day, complaining of a hot and uncomfortable jury room. The jurors returned the next morning and issued their verdict after only a short time. There is simply nothing to suggest that the length of the deliberation, which in this Court's experience was not unusually short, supports the conclusion that there was insufficient evidence to convict.

The remainder of the Defendant's motions for a new trial consist of a litany of complaints, none of which have merit. He asserts that the Court's granting of permission for the jury to be released until the next day exposed jury members to media reports concerning the trial. However, the Court instructed the jury to avoid the media and the Defendant has offered nothing beyond mere conjecture that they did not comply with the Court's directive. The Defendant also takes issue with the Court's statement that he would not be available in person to take a verdict on the following day because of a long standing professional obligation. The undersigned instructed the parties and the jurors that he would be available by cell phone and that another district judge would be available prior to the return of the presiding judge. Jamal complains that, in the absence of the undersigned, there was no procedure for jury questions or raising a mistrial; however, neither occurred.[2] He further posits that there was no inquiry of the jurors upon their return the next day whether they had

---

[2]This assumption by the Court is based upon the fact that neither party placed a cellular phone call to the undersigned; nor did counsel or the jury address any motion, written or otherwise, or question to the Court or to the district judge assigned to take the verdict in the absence of the undersigned.

been influenced in any way, they received no instructions, and one juror arrived late. First, as the jury had been fully instructed on the preceding day, it was unnecessary that they be instructed again. Second, the Defendant has failed to assert, much less demonstrate, that he was prejudiced by the alleged tardiness of a juror, see Fed. R. Crim. P. 52(a), and, as noted previously, has only speculated on the possibility of media influence. While Defendant's counsel hints darkly that "[t]here is no record of the circumstances that caused . . . the abrupt change in the 'deadlock' with 'strong divisions' to a unanimous 'guilty on all counts' verdict within approximately 1/2 hour on Friday morning," he has offered no evidence whatsoever to support this bald assertion. Moreover, his suggestion that the absence of the presiding judge on Friday had any bearing on the jury's decision is specious to say the least.

The Defendant's assertion that the Court "planned a shortened trial schedule for trial" which impacted the conduct of the trial is also baseless. The Court did not plan a short schedule and, in fact, conducted a lengthy jury charge conference and permitted defense counsel time to present whatever evidence he deemed necessary. At no time during the trial did defense counsel voice any complaint about not being allowed sufficient time to present his case. The Defendant also avers in his motion that the time for closing argument was somehow cut short. However, the Court initially denied defense counsel's request for an hour for such argument on the grounds that such a long period of time was simply unnecessary. Ultimately, the Court permitted 45 minutes for each side, with which the Defendant agreed.

Jamal also avers that the Court erred in failing to require the Government to submit a bill of particulars. On March 31, 2004, Magistrate Judge Diane Vescovo, pursuant to an order of reference, issued an order denying a motion for a bill of particulars filed by the Defendant, finding that the

indictment was sufficiently detailed to provide adequate notice of the charges against him, to minimize surprise at trial and to provide a basis for a plea of double jeopardy in any subsequent prosecution.  <u>See</u> Order Granting Pl.'s Mot. to Reconsider and Denying Def[.'s] Mot. for Bill of Particulars at 4-6; <u>see also</u> <u>United States v. Birmley</u>, 529 F.2d 103, 108 (6th Cir. 1976) (the purposes of a bill of particulars, which should be considered by the court in ruling on such a motion, are (1) to ensure that the defendant understands the nature of the charges so that he can adequately prepare for trial; (2) to avoid or minimize the danger of unfair surprise at trial; and (3) to enable the defendant to plead double jeopardy in the event he is later charged with the same offense when the indictment itself is too vague and indefinite for such purposes.) As the Defendant has acknowledged in his motion, the determination of whether to grant a motion for bill of particulars filed pursuant to Fed. R. Crim. P. 7(f) lies within the sound discretion of the trial court.  <u>See</u> <u>United States v. Perkins</u>, 994 F.2d 1184, 1190 (6th Cir.), <u>cert. denied</u>, 510 U.S. 903, 114 S.Ct. 279, 126 L.Ed.2d 230 (1993).  In order to show that the trial court abused its discretion in denying such a motion, a defendant must show "actual surprise at trial and prejudice to [his] substantial rights by the denial." <u>United States v. Rey</u>, 923 F.2d 1217, 1222 (6th Cir. 1991) (citations omitted).  In this case, the Defendant has not identified any actual prejudice he has suffered as a result of the denial of his request for a bill of particulars. Accordingly, the Court will not grant a new trial on that basis.  <u>See</u> <u>United States v. Robinson</u>, 390 F.3d 853, 867 (6th Cir. 2004), <u>reh'g en banc denied</u> (Feb. 25, 2005) (no abuse of discretion where defendant failed to specifically identify any actual prejudice).

The Defendant next avers that a new trial is warranted on the grounds that venue was appropriate not in this district but in Minnesota, where he now lives, based on the "absence of support for Somali witnesses" and the financial hardship involved in traveling to this district. Fed.

R. Crim. P. 18 provides that "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed." Moreover, the Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. The Sixth Circuit has stated that "[v]enue is . . . appropriate only in the district where the conduct comprising the essential elements of the offense occurred." United States v. Wood, 364 F.3d 704, 710 (6th Cir. 2004). In this case, the evidence showed that the asylum application was completed and the interview conducted in the western district of Tennessee and documentation filed in Houston, Texas. No part of the crime for which Jamal was convicted occurred in Minnesota. As venue in this district is therefore proper based upon the requirements of the Constitution and the criminal rule governing venue, and as the Defendant has made no allegation of prejudice, the motion for a new trial on the grounds of venue is denied.

Jamal also argues that venue was improper in this district because the § 1546 counts should have been prosecuted in Houston, Texas where the application at issue was "presented." For the reasons articulated therein, this Court, on May 28, 2005, denied Jamal's motion to dismiss based on the same argument, finding that venue would have been appropriate in either this district or Houston. The Defendant's post-trial motion to dismiss the indictment on the grounds that Houston was the appropriate venue will be addressed in a separate order. In any case, as no prejudice has been alleged, the Court will not grant a new trial on that basis.

The Defendant's contention that the Court erred in failing to permit him to present evidence of post-event actions tending to show an innocent state of mind also fails. Specifically, the Defendant argues that his "conduct, after completing the Asylum Application, included consciously

15

and intentionally drawing attention to himself and putting himself in direct contact with the very governmental agencies responsible for ferreting out immigration fraud, the Court prevented the defense from introducing relevant evidence to show that Mr. Jamal was not conscious of mistakes, errors or wrongdoing regarding his application." (Mem. in Supp. of Mot. for a New Trial Arising from Cumulative Trial Error at 11.)  In support of his position, Jamal refers the Court to United States v. McCorkle, 511 F.2d 477 (7th Cir. 1974), which he describes as a "similar setting" in which the court erred in "foreclosing the defendant from offering 'subsequent conduct' and 'innocent statements' to show an innocent state of mind." (Mem. in Supp. of Mot. for a New Trial Arising from Cumulative Trial Error at 11-12.)  The case is in fact of little assistance to the Defendant.  In McCorkle, the defendant appealed his conviction for willful failure to file tax returns on the grounds that the trial court erred in limiting his cross-examination of the government's witnesses, two Internal Revenue Service agents.  McCorkle, 511 F.2d at 478.  The agents testified at trial as to statements made by the defendant during conversations conducted by them prior to the indictment.  On cross-examination, the trial court denied defense counsel's request to question the agents with respect to additional statements made by the defendant tending to show his lack of willfulness.  Id.  The doctrine of "verbal completeness" argued by the defendant on appeal "prescribes that the defendant may bring out on cross-examination that testimony which might qualify, explain, limit or contradict the portion offered by the Government on direct examination."  Id. at 479.  The Sixth Circuit overruled the lower court, concluding that the proffered testimony was highly irrelevant to "defendant's state of mind at the time the returns were due."  Id.  On rehearing en banc, the Sixth Circuit found that, while the excluded testimony "might be probative of [the defendant's] general state of mind, it does not explain or qualify" the state of mind necessary for a conviction.  United

16

States v. McCorkle, 511 F.2d 482, 487 (7th Cir.), cert. denied, 423 U.S. 826, 96 S.Ct. 43, 46 L.Ed.2d 43 (1975).

In the matter at bar, the evidence sought to be admitted by the Defendant was hardly part of the same utterance as testimony offered on direct examination, as was the case in McCorkle, but involved possible inferences regarding a guilty mind to be drawn from the fact that he regularly appeared in public at various meetings and functions in his community. Furthermore, there has been no allegation that the proffered evidence would have "explained" or "qualified," except in the broadest of terms, Jamal's general state of mind relative to his presence in the United States. In any case, in its response to the motion, the Government notes that, contemporaneously with its April 16, 2004 motion to quash subpoenas issued by the Defendant, it submitted to the Court the affidavits of proposed witnesses who stated that they had no knowledge of the facts of this case and did not know Jamal during the period alleged in the indictment. The Court entered an order granting the motion on May 19, 2004. Moreover, the Government states that, at Jamal's request, it introduced at trial the Defendant's entire immigration file, which included numerous newspaper articles regarding his post-event character traits. Thus, as whatever relevant information that may have existed was before the trier of fact, the Court finds no prejudice.

The Defendant next takes issue with the evidence adduced at trial, supported by a document designated as Trial Exhibit 29, that he possessed a Somali passport. Although he argues that such information was not relevant to the proceedings, the Government appears to concur, noting in its response to the motion that it has never adopted a position that Jamal had a Somali passport and that the witness who testified about the passport for the first time in responding to cross-examination, stated that, based on her experience as a border officer, Jamal probably would have used a Somali

17

passport to enter the United States.  On redirect, she acknowledged that she had no personal knowledge of Jamal's possession of such a document.  Thus, a request for a new trial on this ground is unsupportable.  In addition, the Defendant avers that Trial Exhibit 29 was not made known to the defense prior to trial.  The Government advises the Court, however, that the document was provided to the Defendant on June 27, 2003 pursuant to Fed. R. Crim. P. 16.

In addition, Jamal submits that the jury instructions were improper based upon the "complex, compound questions" and the "jury deadlock" and upon the obligation of the jury to look at the answers to the application questions as he contends he understood them.  As the Court has found herein that these arguments are without merit, there is no basis for a finding that the jury instructions were inappropriate.

The Defendant claims that a new trial is required because of newly discovered evidence, discovered during trial, confirming that this prosecution arose as a result of his public objection to the closing of Somali-owned wire services in Minnesota called "Hawallahs" following the September 11 attacks and calling into question the Government's statements during opening argument that this case was not about "terrorism."  The information, he contends, vitiated the testimony of Special Agent Rick Petrie to the effect that the immigration investigation was precipitated by informants. He also avers that such evidence was in the possession of the Government and was not provided to the defense.  In response, the Government submits that no evidence was adduced at trial to support such a contention, and that the investigation began following the receipt of information that Jamal was a Canadian citizen in the United States illegally.  The Government reiterates its argument referenced earlier herein that Jamal's entire immigration file, which included newspaper articles concerning the incident and documentation of the information received by federal agencies, was

provided to the Defendant..

In his reply, the Defendant offers documentary evidence signed by Petrie, which he assumes may not have been in the Government's possession prior to trial,[3] stating that "[t]his case originally came to the attention of the INS in Minneapolis during a Hawalla investigation." While he attempts to make much of this statement, the next sentence in the document belies its importance: "The information indicated that [Jamal] was a Refugee in Canada prior to applying for asylum in the United States." The remainder of the document--a customs service investigation report--goes on to describe Jamal's Canadian status. Another document in the immigration file, a letter from the INS to Canadian immigration authorities dated January 2002, requests assistance in an investigation conducted by the INS, the Federal Bureau of Investigation and the United States Attorney's Office of "a number of individuals seeking immigrant benefits in the United States [who] may have received immigrant benefits in Canada and, therefore, may be subject to criminal prosecution." (Ex. to Government's Supplemental Resp. to Mot. for a J. of Acquittal and for a New Trial.)   Upon review of the evidence, the Court is satisfied that the Government has provided the Defendant with all the evidence it was required to produce and that the document proffered by the Defendant does not establish that he was prejudiced.

Also with respect to Mr. Petrie, the Defendant maintains that, during jury deliberations, Petrie told defense counsel outside the courtroom that, contrary to the position taken by the Government, it was his belief that Jamal actually was in Kenya in 1997. The Government adamantly denies this assertion and Jamal has offered no evidence in support of his claim. Accordingly, the Court cannot

---

[3]Defense counsel claims he found the document after his return to Minnesota following trial, while going through papers gathered from the defense table.

19

grant a motion for new trial based on the information before it.

The Defendant's next assignment of error involves his decision not to call certain witnesses, including Lul Hussein, Sili Dirie, Abdikadir Jama and Phil Steger. According to the record, Jamal never proffered these witnesses. Thus, he cannot now complain that their failure to testify constituted error by the Court. To the extent the Defendant lays blame for the failure to call these witnesses on alleged errors of the Court, the undersigned's denial of those alleged errors herein renders any such assertion here fruitless.

For the foregoing reasons, the motion of the Defendant for acquittal and the motions for a new trial are DENIED.

IT IS SO ORDERED this 26ᵗʰ day of May, 2005.

J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 139 in case 2:03-CR-20104 was distributed by fax, mail, or direct printing on May 31, 2005 to the parties listed.

---

C. Peter Erlinder
WM MITCHELL COLLEGE OF LAW
875 Summit Ave.
St. Paul, MN 55105

Linda N. Harris
U.S. ATTORNEY'S OFFICE
167 N. Main St.
Ste. 800
Memphis, TN 38103

Honorable J. Breen
US DISTRICT COURT